Good morning everyone. The first argued case this morning is number 13-1386, Tyco Healthcare Group against Mutual Pharmaceutical Company, Mr. Johnson. Thank you, Judge Newman. Thank you, Your Honor, and may it please the Court. This Court has repeatedly held that where a generics, abbreviated new drug application, directly addresses the question of infringement, that that document controls the infringement inquiry for purposes of Section 271E2 of the Patent Act. And in two cases decided well before Tyco brought this suit, this Court held that a generic is entitled to summary judgment of non-infringement where it's and a quote, requires the proposed drug to have a specific surface area outside the claimed range. But this isn't a question of whether your surface area is outside the claimed range. This is a question of what testing protocol you would use to decide what range the surface area of your composition is in. It's about the testing protocol, not the manufacturing and not the actual composition itself, but what testing protocol you would use to ascertain what the range is. The only dispute among the experts, Your Honor, is over the outgassing test, the outgassing temperature that's used. Yes, but that's the core of the case, isn't it? Yes, but that's not. It's 40 against the 105. I'm sorry, Your Honor. The 40 degree is against the 105 degree. Correct, but the patent here doesn't even speak to the issue of outgassing and ALON spoke specifically to the question of testing protocols. Let me compare for you the argument made in ALON with the argument made here. This is a quote from page 1248 of ALON. ALON has not specified a validated test protocol or test equipment to measure its SSA. So there are genuine issues of material fact as to whether ALON will be able to comply with its SSA specification. This is a quote now from Tyco's brief in this case on page 46. Mutual's ANDA did not specify what testing protocol and methodology it actually used. Page 48, Mutual has not specified, quote, appropriate test call parameters for measuring SSA. There's never been any dispute that if Mutual produced a drug that complied with the SSA stated in the ANDA that there wouldn't be infringement. It was all about how do you determine whether they're doing that. And that's the testing dispute and that's the very same issue that ALON decided. But the issue before us is whether this is sham litigation, not whether they specifically followed word for word one case on its facts. That's correct, Your Honor. But, of course, ALON has an objective meaning. And it was interpreted two years later in Abbott v. Torfarm case to say specifically that if the surface area claimed or stated in the ANDA is outside the claimed range, we read ALON to say summary judgment of non-infringement for the generic. Well, here's my problem in getting back to the 40 degrees and 105 degrees. Everybody agrees, the two experts and the district court, that at 105 degrees Mutual's surface area, SSA, would it be within the infringing range, correct? Correct. So the whole question, everything turns on whether the right point of testing is 105 or 40. Not exactly, Your Honor. It may turn on that for Section 271A of the Patent Act, but not for 271A2. And Glaxo, it seems to me that what we have said is that where the ANDA doesn't make – doesn't say enough to make it clear that the product that is produced pursuant to the ANDA would fall outside the claimed range, unlike ALON. But in that situation, you need more evidence. And the contrast between Glaxo and ALON, which the court addressed in ALON, is exactly why this suit didn't have an objective basis. Look at what the court said. It states the general rule. It says if you've got a compound that's not well-defined, then you look at other evidence concerning infringement. But if the compound's well-defined, then you look at the ANDA. And the court distinguished Glaxo and said that was a case where the patent claimed one form of a compound. And the ANDA said, well, our drug has 90 percent of this other form of the compound. But it didn't affirmatively state that the other 10 percent wouldn't contain the patented form. Here, you've got a situation involving specific surface area. Square meters divided by grams. It's a standard objective measurement in ALON. It's a standard objective measurement, but it can't be measured with current technology directly. So we have to measure it indirectly with the gassing system. And what numbers we get apparently depend entirely on or largely on the outgassing temperature. Two hours at 105, infringe. Two hours at 40, not infringe. It seems to me that I'm having a hard time seeing why that doesn't bring this case outside of the ALON type case. Obviously, the Hatch-Waxman Act creates a particular structure for dealing with these kinds of disputes. And ordinarily, the brand gets something that it doesn't get in any other kind of case. In other cases, you don't get an automatic stay of the generic marketing. Here you do. The tradeoff is that the ANDA controls the E2 infringement inquiry. Now, if the generic says, we're going to go ahead and sell a drug, and we're going to take our chances. They get FDA approval, and they sell a drug, and it turns out that that infringes, they've got two sledgehammers coming down on them. One is the Section 271A damages problem. And the other is the possibility of never selling a drug again in the United States and criminal sanctions. So that's the tradeoff. Okay. So we have so little time. And you're not going to think that I'm helping you, but I am. I'm not with you at all on your ELON argument. However, I think you might have an argument in another place. And so I really want you to go there, because as far as I'm concerned, you're kind of spinning your wheels with me on this. And, I mean, if other panel members have more questions, they'll bring you back to ELON. Of course. I'm all ears, Your Honor. So here is my question. What basis is there in the record for why 105 degrees has to be what it's tested at? Does the patent say it? The patent does not speak to outgassing temperatures full stop. So how is the patent definite? It says, I mean, I know that that's not really the exact issue, but it's telling you you have to have an SSA within this range, and it doesn't tell you what temperature, and temperature absolutely dictates the SSA. I don't understand. Well, I think they've got a problem either way. I mean, if stating the SSA range in the patent without claiming the specific temperatures in the claims, and they're not even in the example in the specification, makes it indefinite, then they've got that problem. But they've got another problem at the other end, and that seems to be the problem of ELON. So on the other end, we're looking like we're trying to figure out what Tyco knew and whether it was objectively baseless, not only at the time they filed, but throughout at least the duration of the 30-month stay, because at any point in time, if they knew it was objectively baseless, they had an obligation under PRE to pull out. Fair enough, Your Honor, yes. So here's the question. Why wouldn't it have been objectively baseless then, given that – okay, so if – this is tough technology for me, so just bear with me. I'm not a chemist either. Yeah, if you say you heat it at 40 degrees and you get a surface area of 2.2 or higher, wouldn't anyone of skill in the arts think if you go higher than 40 degrees, all the way up to 105, surface area is actually going to go higher, not lower? Because surface area – right? I mean, you're talking about the outgassing, the removing of the molecules so that the gas can then coat. So it seems to me if you raise temperature, SSA automatically goes up as a matter of technological fact, immutable principle of technologically chemistry fact. And so the only way increasing the temperature at which you're going to test your compound can result in SSA going down is if something goes awry, i.e. the degradation of your molecule, the complete breakdown and globbing together of all this stuff. Well, and in fact, the district court spoke to that question. And we're not disputing that there's a basis for a 271A claim and some of those things are relevant to that. And he said you heat it to that level. There's expert testimony here that you melt it down. You change the chemical composition. So the thing is, the question for me is at what point should Tyco have realized that that would be the state of the world? And because your expert, of course, report came in well after the 30-month stay was over. So your expert report can't be the touchstone for them having to realize that it was objectively baseless. Well, let me direct you to something in the record. You'll find it on page A5942. And it was a memorandum from the R&D department at Tyco to the chief lawyer at Tyco. And it said how you work around this patent. And it said, in essence, I won't quote it because it's a confidential document, you make the particles smaller. You make them smaller. That's how you avoid infringement. That is exactly what Mutual did. So you not only have AILON. That's the HOG memo? Correct. You not only have AILON. You not only have Torfam saying this is how we read AILON. You not only have something that's quite black and white, SSA. You have internal documents from Tyco saying this is a piece of cake to work around. And then Mutual did exactly what the document said. I recognize, as you say, that the patent does not include the outgassing temperature specifically. It references in the specification example a particular protocol, but it doesn't have an explicit reference to 105. Even though that apparently was the outgassing temperature that Sandoz used. I take it that there's evidence for that effect in the record. Well, it doesn't speak to their NDA. Let me ask you this question. If the patent had included a reference to 105 as the proper outgassing temperature, along with the reference to the rest of the testing protocol, would you lose this case? If it had been in the claim, then I think you might have a reasonable basis. What if it had been just in the specification? I don't think so, Your Honor. It's a clear indication of giving any reader of the patent an understanding that when we talk about this range, we are talking about a range that is the product of a protocol that includes 105. This Court's precedents have been clear, and they're collected in our brief, including on bonk decisions like the Phillips decision, that you don't incorporate those things into the claim. It's a non-starter. But you don't have that case here. What that's doing is telling you, it seems to me, that when you put 40 degrees in your NDA, that you are not really being responsive to the range that was established and generated by testing at 105 degrees. Isn't that the case? I don't agree, Your Honor, but in any case, AILON decides as a matter of law. No, stop it, AILON. Stop it. You've lost on that. Just give it up. So here's my question. Would a reasonable, skilled artisan have used 105? Since 105 is not in the patent, and you don't have a way of knowing 105 degrees is the range that dictates the SSA range in the patent, 105, because the temperature dictates the range. So would one of skill in the art, at the time FICO filed this, have thought 105 is the temperature at which these things ought to be tested to determine what the range is? Absolutely not. In fact, this is something that the district court looked at at the preliminary injunction stage, and inside with our expert. Well, the record shows or suggests, and this is what they were testing at, that testing for this purpose in order to degas should be done at a temperature over 100 C. And that this was the standard temperature. This is what this testing agency had been doing all along. That's why I come back to this sham. The question is not whether it was right or wrong or whether it did or didn't avoid infringement. Of course. The question is whether that was so unreasonable to compare the surface area tested at 105 as to fall within the parameters of sham litigation. And we don't dispute, Your Honor, that there was a valid dispute about those issues for purposes of 2 section 1A. But AILON uses the phrase, not material, to describe disputes over testing protocols and testing equipment. For 271E2 purposes. Because a different product in a different case had certain words used to describe the outcome, this litigation was sham? I'm saying the rule of AILON is that testing protocol disputes are not material to 271E2. Obviously, there are differences, always differences between two cases. It depends. If you have a parameter which varies so dramatically between 40 and 105, then perhaps it is distinguished from the facts in AILON. But AILON decides as a matter of law that SSA is not such a parameter. I see you have one minute left, so I'd like to reserve the remainder of my time. Let's hear from the other side. Mr. Strand? Thank you, Judge Newman. May it please the Court. The District Court's final judgment dismissing Mutual's antitrust claims against Tyco should be affirmed. We focused on the entire sham litigation question under BEAR v. ELAN. And as you all have figured out, the reliance that the appellant places on the BEAR v. ELAN is simply misplaced. There are numerous bases upon which that case can be distinguished. It is not a matter of law determination in this case. Let's review what... I would really rather you focus on, if you don't mind, I mean, if my colleagues have other questions, I'm sure they'll bring you back to ELAN. But I want you to focus on whether or not it was reasonable for Tyco to think that the Mutual product ought to be tested at 105 degrees and then the SSA measured at that temperature at the time it filed suit. Yes, it was reasonable, Your Honor. Here's why. Going back to before 2001, Sandos had measured the product at 105 degree outgassing temperature. That temperature had been used by PTL, Particle Testing Laboratories, and had been validated. Upon acquisition of the active... Did it cause a degradation in the Sandos molecule? Not that anyone knew of, Your Honor. And, in fact, the melting point of the API, of the molecule, is much greater than 105 degrees centigrade. So there was no reason to believe that. There is a conundrum on the record in this case that no one has yet answered, that the product developed by Mutual seems to respond differently in the testing protocol than the product developed by Sandos and Tyco. No one has ever explained that. It is an anomaly, and I'm not a chemist either. I won't attempt to explain it, but the simple situation is this. At the end of the day, looking past the critical date here, the PRE, what they knew before the date the suit was filed, it is unequivocally true that the Mutual product tested at 40 degrees shows 2.2, meeting the ANDA specification, and the Mutual product tested at 105 shows 1.1, infringing, which is exactly the reason that this case shouldn't be controlled by Bayer v. Elam. So to answer your question more fully, Sandos had tested at 105, validated by PTL, in 2005, and then again in 2002, and again in 2006, 2007. What about what I said before, which I understand is a matter of chemical fact, which is if you test at 40 degrees for two hours and you get an SSA of over 2.2, no reasonable person would have thought testing at a higher temperature would have resulted in a lower SSA. That automatically, as a matter of chemical fact, if you're going to increase the temperature and keep all the other parameters of the testing identical, it only could raise SSA unless there is a serious and problematic degradation of the molecule. So why would it be reasonable for Tyco, in light of that technological fact, knowing that in the end, testing at 40 gave this SSA, why was it reasonable of Tyco then to say, yes, but if you test at 105, it's going to give a lower SSA? Why? Several answers to that. One is that's not what our experts said below. What do you mean it's not what your experts said? I'm not sure I agree with you on the matter of absolute chemical fact. Our experts said no, that necessarily wasn't true. But more importantly, going back to the time before the filing of the lawsuit. Can you point me to where your experts... I'm not sure that that's in the record. ...agreement with that notion because I don't think that it is... I'll try to find that. ...reasonably in dispute. But, I mean, I may be wrong. I'm not a chemist. Norma, looking to the PRE date, what a reasonable litigant would have known before the lawsuit was filed? Yeah, it's not before, right? If you figured out while the lawsuit was ongoing, you had an obligation to pull out. There's nothing in PRE that limits it to the time of the filing of the suit. You guys were trying to get a 30-month stay. So at any point, while there continued to be antitrust harm in the form of a 30-month stay, if at some point you realized you weren't entitled to it, you had an obligation to pull out. There was, in fact, Your Honor, a test done by PTO, the same lab, for Mutual on Mutual's product in December of 2008 at 105 degrees centigrade, that showed a 1.1 result. Thus, I think... But did it show the 1.1 result because the molecule degraded and globbed up? The experts never figured that out. Mutual argued that that was the case. We argued that it wasn't. The point is that... The evidence that's in the record at 2462 and 2464 showing both the tendency over increases in the outgassing temperature and, even more dramatically, the increased size of the particles at 105 as compared to 40, certainly suggests that's what's going on. Don't you agree? It may suggest that, Your Honor, but that wasn't unequivocally proven true at the time Tycho filed the lawsuit, after receiving the paragraph 4 letter. But at some point in the course of the proceedings, Tycho had this evidence before. It had the evidence before, but it also had the test result that Mutual had done in December of 2008 showing an infringing result at 105 degrees outgassing temperature. Right, but that infringing result, the question is, what caused that infringing result? And this evidence seems to suggest that the size of the particles increased at 105 and, therefore, the surface, the SSA, decreased. That's fine, Your Honor, but let's get back to the point that's before us, the sham litigation. If you get the result at 105 of 1.1 and at 40 you get 2.2, then the question is this. What happened ultimately under the claim construction? The court comes forward with a claim construction. It does not reject 105 as a test. It rejects it as the sole test. So we have the anomalous situation in this case, which is the reason Behr v. Elan doesn't apply, that you can do a test at 105 degrees centigrade, fall within the ambit of the scope of the patent and of the claim, and find an infringing result. You can do a test at 40 degrees centigrade and find a test not within the scope of the patent claim. Wait a minute, wait a minute, wait a minute. Are you claiming that under the claim you get any molecule that falls within your SSA range tested at any temperature? So are you claiming to me that maybe there's some other molecule out there, not mutual, which tested at 105 will not fall within your claim range, but tested at 40 will, and that your claim covers that too? Sure, Your Honor, based upon the record of this case. But then you have a limitless range. How is that possible? You have no range at all. You have every range. Your Honor. If it's some temperature, it's going to fall within your range. Would you take that up to the melting point? No, probably not, Your Honor. So you're not. But Your Honor, here's the point that we have in this case. We have falling within the scope of the patent claim based upon the court's construction. It was done in January of 2009. We have it completely appropriate, at least under that claim construction, to have 105 degrees centigrade temperature and a 40 degrees centigrade temperature for outgassing. Neither one is limited nor excluded, which is the reason I get back to our test. Was it, would a reasonable litigant, faced with what Tycho knew at the time it filed the lawsuit, think it might have a possibility, it might have a chance of succeeding on adjudication of the emerits? We're not here arguing about chemical technical points. It's what did they know. They knew that they had six or seven years of results at 105 degrees centigrade. They knew that Mutual had come in and that they had gotten inconsistent results using PTL, variation. They knew that Mutual had come in using the same testing laboratory with a different numbered test with a much lower outgassing temperature and had declared 2.2 specific surface area and yet had claimed bioequivalent. Something wasn't adding up. So could a reasonable patent owner, could a reasonable patentee under the circumstances believe that it might have the possibility of succeeding on the merits? And that's why they filed the lawsuit. I've got to go back and ask the question again because I'm just sitting here absolutely delirious with your answer. I don't mean to make you delirious, Your Honor, I apologize. I just can't fathom, I guess I always assumed, obviously wrongly, that your view was that the range in the SSA is only to be measured at the temperature of 105 and that was effectively a limitation of the claim by virtue of that being the range, which by the way you never point out to us, but my clerk just found the USP and discovered that actually 105 is the range. In the USP, yes. So I just always assumed that you were always believing and accepting as given that the range has to be definite. You can't just have an indefinite range. And that you were always accepting and arguing very reasonably that it was a particular temperature that had to be used by everybody to determine the range. Is it really true that you're arguing that any temperature can be used and then if the molecule at any temperature of testing falls in your SSA range, that that is what you're entitled to claim? Well, Your Honor, let's get... Well, you said a few minutes ago, you heard the gasp... I was clearly, I didn't mean to make you gasp. I was clearly, we have to, I was imprecise. There are different time frames here, Your Honor. When the court sets down its claim construction, what I was telling you about was what the court's claim construction means. That was never tested below. Prior to the court's claim construction, absolutely, Tyco was arguing that there was a specific, in the specification, there was a specific test, the BET test that was outlined. The USP set forth 105 degree temperature and Tyco was of the view that 105 degree temperature was the right temperature to use, that a person of ordinary skill in the art would turn to that temperature. And in fact, Mutual's own expert later on said, having used that 105 degree temperature, it would appear to be reasonable to continue to use that 105 degree temperature. That was where Tyco was. You believe 105 is required by the claim, because if you vary the temperature, you will have variations in SSA. And since you have to have a definite claim, that 105 is effectively a claim limitation. I want yes or a no from you. Because otherwise... It depends on when, Your Honor. We believed that up until we got the claim construction, but the court told us that belief was incorrect. So now I have to deal with the claim construction going forward. That's the law of the case. I may disagree with the court's claim construction, but that's the law of the case. So what we now have, under that claim construction, the phrase surface area is not limited to the measurement method stated in example one. That's out of the court's claim construction ruling. I now have the situation that I described to you that caused your disillusionment with my position. Until the court's claim construction, our position was that a person of ordinary skill in the art, reading the USP, reading the patent specification, knowing what was going on, would test at 105 degree outgassing temperature. The 105 degree outgassing temperature was not in the patent, but that's what we argued. We lost on that. But again, would it be... I haven't looked, but if I do go back and look, which I will, at all of the briefing, I'm going to find you as having argued, or your client as having argued to the district court, that this claim is definite and 105 is the temperature that determines the SSA range and whether or not it falters in the claim. That's what I'm going to find. Because otherwise, you're asserting an indefinite claim and that is objectively baseless and problematic. So I want to make sure that you're being consistent now with what you argued to the court. Your Honor, it's not an indefinite claim. That was never raised below, and it's not before the court at this point in time. Clearly, Tyco did not believe it was an indefinite claim at the time it filed suit. It believed it was a definite claim. It had used the 105 degree outgassing temperature for seven, six, seven, eight years over two companies. Mutual's own experts said it was reasonable to use that temperature. They filed the lawsuit on the basis that they thought that was the reasonable temperature to use. They were disabused of that notion by the court's claim construction ruling. That's what I'm saying, Your Honor. And if you now believe that it's an indefinite claim, fine. It was never raised below, so it's been waived. It's not before the court at this time, and there is absolutely nothing in the record that would suggest that it was objectively baseless to file the claim. You would be asking Tyco to sit there and say, what is every possible defense to this patent? Trace it out to the absolute ultimate degree and draw the clue of collusion before filing a lawsuit. That is not what PRE said. Well, no, I'm just trying to figure out whether or not it was reasonable at the time the suit was filed for you to believe that 105 degrees was the right temperature in which to determine the level of the measurement of the SSA. And that's what I'm trying to figure out. And if your argument was it doesn't matter precisely what temperature, all that matters, regardless of what temperature you use, is that it falls within this range, then you see you've created a sliding scale in your claim. Your Honor, and I apologize. Now I understand where I led you astray and I did not mean to do that. Tyco's position has been consistently that 105 degrees is the number, period, throughout. We still believe that's correct. But given the claim construction, that went away. But no, we did not believe there was a sliding scale that anything that led to 1.1 or below, the range 1.1 or below, would be infringed on. And a person of skill in the art, you say, reading the patent, would conclude that 105 is the right temperature if they wanted to replicate the protocol, the testing protocol, because of the USP? Is that basically what you're saying? Because of the USP. We had expert testimony and expert report after the lawsuit was filed where he came forward and argued, opined, that a person of ordinary skill in the art would know to use that temperature. That the 40 degrees was too low because you didn't affect the outgassing of all of the volatiles that you needed to outgas. Which would seem to produce a lower, if all the volatiles are not out, then fewer molecules of krypton end up aggregating around the particles and you end up with a lower SSA, right? I agree. I agree. But, and that's part of the conundrum of this case, that the experts grappled with, and really no one ever got a proper response to. The one thing that everybody did agree was that if you outgassed at 105 degrees, you ended up with an infringing result. Yeah. Okay. I think we have the argument. Thank you. Thank you very much, Rona. Mr. Johnson, you have ten minutes. Thank you. I want to begin with a quick point about ALON with all due respect to your questions, Judge Moore. Your time. ALON says, factual issues as to whether ALON can comply with its specification, including test protocols for how to measure the SSA, are not material. So if you conclude that this whole dispute is about how you measure SSA, ALON says it's not material. Now, on the issue of the 105 degree outgassing temperature, look at the patents. There's nothing about outgassing. Nothing. Now, there is, in one of the examples in the common specification, the reference to a test for how you do SSA. That's not even what the dispute is over. The dispute is about how you do the preparatory period of getting the vapors off the particles before you test their SSA. The dispute before us is whether their litigation was sham, not whether there was infringement. Absolutely, Your Honor. And obviously, it's a necessary but not sufficient condition to prevail on the merits to get to the sham issue. But here you've got ALON, Tor Farm, and their own admission that all you do to work around this patent is make the API smaller. That's exactly what Mutual did. Okay, thank you. Could I ask one more question? I'm sorry, Judge Newman. Okay. Just very quickly. The district court said at A8 that Tyco had no access to any sample of Mutual's generic temazepam to test at the time that the period for filing infringement suit had expired. What is the situation with respect to the access, Tyco's access to Mutual's temazepam? Did you offer it and the offer was declined in effect or at least not taken up? Is that your position? Correct. At the notice letter stage, that's correct. All right. Thank you, Your Honor. Thank you, Mr. Johnson. Mr. Strand, the case is taken under submission.